IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                                                PLAINTIFF

v.                                    Case No. 4:23-cr-00176 KGB

URIEL HERNANDEZ BERRUQUIN                                                          DEFENDANT

**ORDER**

Before the Court is defendant Uriel Hernandez Berruquin's motion to suppress (Dkt. Nos. 52; 53). The United States responded in opposition to the motion (Dkt. Nos. 59; 75). The Court conducted two hearings on the motion (Dkt. Nos. 69; 74; 80). Mr. Berruquin and the United States filed post-hearing briefs (Dkt. Nos. 83; 85). For the following reasons, the Court denies the motion to suppress (Dkt. No. 52).

I.      **Factual Background**

Based upon the parties' filings, along with testimony and evidence presented at the second hearing on the motion, the Court makes the following factual determinations.

A.      **Events Preceding Initial Stop**

On June 12, 2023, Arkansas State Police ("ASP") Trooper Cody Martin was contacted by the Alabama 17th Judicial Drug Task Force ("JDTF") and advised that a tractor-trailer rig owned by Mr. Berruquin operating under the name of Empire ("Empire") was traveling eastbound from Texas and passing through Arkansas. Trooper Martin was told the business was suspected of being involved in drug trafficking (Dkt. No. 1, at 2-7).

The Court heard testimony from Agent Robbie Autery who works with the JDTF (*see* Dkt. No. 81). Agent Autery learned of Empire when he discovered a large amount of United States currency secreted in hidden compartments underneath a triple-axle drop trailer being hauled

westbound without a load by a tractor registered to Empire, whose owner is Mr. Berruquin. Agent Autery began to investigate Empire and logged license plate tags registered to Empire into a system that accessed license plate readers. On another occasion, on or about June 12, 2023, Agent Autery's partner called him after performing a traffic stop on another Empire tractor hauling a triple-axle drop trailer heading westbound, without a load, just like the previous interdiction. Agent Autery determined that the trailer had previous temporary tags registered to Empire. Law enforcement discovered during the stop that a large amount of United States currency was hidden in compartments underneath this trailer, as well.

Agent Autery got an alert that a license plate reader picked up a tractor registered to Empire moving eastbound from Texas to Arkansas. Agent Autery contacted Lieutenant Dennis Overton and explained the situation. The Court also heard testimony from Lieutenant Overton (*see* Dkt. No. 81). In addition, Agent Autery provided Lieutenant Overton with a description of the tractor, its Texas license plate number, a screenshot of the license plate reader, a screenshot of the next tag picked up on the reader, as well as a photograph of one of the hidden compartments previously located. This information was relayed to Trooper Martin.

### B.   Initial Stop

When Trooper Martin located the tractor-trailer traveling east on Interstate 40 at approximately 8:19 p.m. on June 13, 2023, he observed that it was following the vehicle in front of it too closely (Dkt. No. 1, at 3). The Court heard testimony from Trooper Martin consistent with the information relayed in the probable cause affidavit submitted to the Court (*see* Dkt. Nos. 1; 81). Trooper Martin drove to catch up with the tractor to verify the tag on the front of the tractor, but by the time he caught up with the tractor, the vehicle it was following too closely had either moved onto the shoulder or exited the interstate.

Further, Trooper Martin observed the tractor hauling a triple-axle drop trailer, like the one described by Agent Autery. Trooper Martin observed that the tractor was overpowered for the excavator it was hauling; that the excavator being hauled was facing the opposite direction to the norm; and that the excavator was secured by brand new chains and several new ratchets (*see* Dkt. No. 1, at 3). Trooper Martin was surprised to discover the owner of the trucking company, Mr. Berruquin, sitting in the passenger seat, accompanying the driver on what appeared to be a very standard haul.

The driver, co-defendant David Garza Portillo, was unable to provide any identification that Trooper Martin could confirm through his systems. The process of attempting to identify Mr. Portillo took approximately 20 minutes after the start of the traffic stop, and Trooper Martin was never able to confirm Mr. Portillo's identity. The inquiry ended with only a screenshot of what Mr. Portillo showed Trooper Martin (*see* Dkt. No. 1, at 4). During these efforts, Trooper Martin also called Lieutenant Overton to notify him of the stop and to inform him of what the occupants stated, to discuss the intelligence the Arkansas State Police had received, to discuss the tags on the tractor-trailer, and to discuss Trooper Martin's next investigative steps.

    **C.**    **Consent**

After completing the process of attempting to verify identities, Trooper Martin exited his vehicle and approached Mr. Berruquin and Mr. Portillo who were standing behind the trailer, between the trailer and Trooper Martin's patrol car. Trooper Martin first asked to search the cab and trailer, after he asked whether Mr. Berruquin and Mr. Portillo were transporting any guns or people (Dkt. No. 82, Gov. Ex. 14, 28:45). Mr. Berruquin offered to permit Trooper Martin to search (Dkt. No. 82, Gov. Ex. 14, 28:54). Mr. Berruquin identified himself as the owner of the

tractor and appeared to speak and understand English well. Consent was given approximately 30 minutes after the initial traffic stop.

During their exchange, Mr. Berruquin offered to permit Trooper Martin to check to make sure they were not transporting guns in the cab, people illegally, drugs, or money (Dkt. No. 82, Gov. 14, 28:56). Trooper Martin then asked Mr. Berruquin, "Do you care if I check the cabin and the trailer and all that good stuff?" (Dkt. No. 82, Gov. Ex. 14, 29:00). Mr. Berruquin answered, "Yes," and he nodded his head. After this exchange, Trooper Martin explained that it was his job to perform criminal interdiction and "arrest people for bad stuff," giving that as the reason why Trooper Martin was "asking if its ok to look around in [the] truck and trailer and all that good stuff." (Dkt. No. 82, Gov. Ex. 14, 29:27). Mr. Berruquin responded, "Yeah, go ahead." During this exchange, after Trooper Martin received Mr. Berruquin's consent to search but before he began his search, Trooper Martin made the comment that he intended to give a warning (Dkt. No. 82, Gov. 14, 29:27).

### D.  Initial Roadside Search

After obtaining consent, Trooper Martin attempted to perform the search of the underside of the trailer by flashlight with the assistance of his headlights. Mr. Berruquin represented that he owned the custom truck (Dkt. No. 82, Gov. 14, 29:19). When asked by Trooper Martin, Mr. Berruquin explained that his trailer was in an accident and being repaired and that Mr. Berruquin had been working with this trailer for two to two and a half months, leasing it (Dkt. No. 82, Gov. Ex. 14, 45:00).

After some inspection and phone calls with Lieutenant Overton, Trooper Martin located areas near the triple axel that appeared to have been tampered with, which turned out to be non-factory compartments. The areas appeared to have been covered with texture spray and to have

had dirt thrown onto the paint while wet. Trooper Martin attempted to wipe the dirt away, but it was stuck to the axel housing (Dkt. No. 1, at 4). Trooper Martin noted that the panels immediately adjacent to this area had not been covered in texture spray. He also noted that the areas, when tapped and knocked on, sounded full, not empty. These areas turned out to be the non-factory compartments.

### E. Moving To Exxon

Approximately 26 minutes passed from the time Mr. Berruquin gave consent until the time that Trooper Martin instructed Mr. Berruquin to move the tractor-trailer to the Exxon gas station parking lot (Dkt. No. 82, Gov. Ex. 14, 54:29). It was during that 26 minutes that Trooper Martin located the hidden compartments believed to be present on the trailer.

### F. Follow-Up Searches

Once the tractor-trailer was moved to the Exxon, Senior Corporal Trent Behnke deployed his K9, who made a positive alert at the area the trailer appeared to have been tampered with. The Court heard testimony from Senior Corporal Behnke (*see* Dkt. No. 81). After the positive alert, Senior Corporal Behnke drilled through the metal at that area, and the drill bit came out covered with a paper material and a white powdery substance (Dkt. No. 1, at 4).

Carlisle Auto Wrecker arrived on scene and hauled the tractor-trailer to its lot for further investigation. Trooper Martin followed the tractor-trailer, and it never left his sight while being transported. At the wrecker yard, Arkansas State Police opened up six axle housings and a "door" secured by a hex key that was discovered on all six housings. A total of 54 packages were seized, with an approximate weight of 66 kilograms (Dkt. No. 1, at 4). One of the packages was field-tested and tested positive for cocaine (*Id.*). Further, a shaving kit was discovered in the cab of the truck that contained $3,000.00 in United States currency (*Id.*).

## II.     Analysis

Trooper Martin had probable cause to conduct the traffic stop. Even if Trooper Martin lacked probable cause, he had reasonable suspicion to conduct the traffic stop. Trooper Martin's observation of the traffic violation provided a sufficient basis for the stop. *See United States v. Thompson*, 533 F.3d 964, 968-69 (8th Cir. 2008) (examining probable cause to stop a vehicle due to a traffic violation and based on the collective knowledge of law enforcement officers conducting an investigation when that knowledge can be imputed to the officer conducting the stop). Further, the investigation into Empire that Agent Autery testified about and the information communicated to Trooper Martin prior to the stop provided reasonable suspicion, if not probable cause, for the stop, as well. *Id.*

After a traffic stop, a law enforcement officer who initiates the stop "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004); *see also United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013). The process of attempting to identify Mr. Portillo took approximately 20 minutes, and running a check on an occupant's identification documents and criminal history is a routine activity previously recognized by the courts as permissible and not an activity that unlawfully prolongs the traffic stop. *See United States v. Cox*, 992 F.3d 706, 710 (8th Cir. 2021).

When Trooper Martin said he would write the driver a warning, Trooper Martin had already obtained permission from Mr. Berruquin to search the tractor-trailer but had not yet begun his search of the tractor-trailer. Regardless, by that point, Trooper Martin's personal observations about the tractor, the load, how the load was secured, and the driver deepened the reasonable suspicion that already existed from the prior law enforcement investigation into Empire testified

to by Agent Autery, and a traffic stop can be extended without running afoul of the Fourth Amendment if supported by reasonable suspicion that criminal activity is afoot. *See United States v. Navarette*, 996 F.3d 870, 874-75 (8th Cir. 2021).

Further, the Court finds that the United States has proven by a preponderance of the evidence that Mr. Berruquin's consent to search the tractor-trailer was voluntarily and freely given and was not revoked. *See United States v. Moreno*, 280 F.3d 898, 900-01 (8th Cir. 2002) (examining factors relied upon to evaluate consent). "When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted." *United States v. Rivera*, 570 F.3d 1009, 1013-14 (8th Cir. 2009). The extension of the traffic stop until Trooper Martin located the hidden compartments and gained probable cause also was reasonable under the totality of the circumstances.

To the extent Mr. Berruquin characterizes the follow-up conversation as an attempt to revoke consent before the search at the Exxon occurred (Dkt. No. 81, Gov. Ex. 14, at 55:00), by the point Trooper Martin instructed Mr. Berruquin to move the tractor-trailer to the Exxon (Dkt. No. 81, Gov. Ex. 14, at 54:30), Trooper Martin had probable cause to search. During the follow-up conversation, Mr. Berruquin referenced his rights and claimed that the trailer was not his (Dkt. No. 81, Gov. Ex. 14, at 55:00). After obtaining consent and conducting a roadside search in the dark, Trooper Martin had determined that six hidden compartments were present on the trailer, were full, and had been covered with a texturing spray and dirt that was inconsistent with the rest of the trailer, adding to the knowledge Trooper Martin already had of the prior investigation testified to by Agent Autery.

Once at the Exxon, Trooper Martin took the additional step of having a K9 unit perform a sweep of the trailer. Trooper Behnke ran his K9 partner around the tractor-trailer, and the canine partner alerted. By the time a drill was used, troopers had probable cause to search.

Based upon a review of the entire record in this case, the Court determines that there was no Fourth Amendment violation. The stop of Mr. Berruquin did not violate the Fourth Amendment. Even if there were a Fourth Amendment violation, Mr. Berruquin's consent to the search was sufficiently attenuated from the stop to purge any taint of illegality. *See United State v. Becker*, 333 F.3d 858, 862-86 (8th Cir. 2003); *see also United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 89 (2017). Moreover, even if there were a Fourth Amendment violation, application of the exclusionary rule would not serve the remedial purpose of the rule under these circumstances. *See United States v. Hamilton*, 591 F.3d 1017, 1027-28 (8th Cir. 2010).

For these reasons, the Court denies Mr. Berruquin's motion to suppress (Dkt. Nos. 52; 53).

It is so ordered this 23rd day of July, 2024.

_____
Kristine G. Baker
Chief United States District Judge